UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNY MICKLE,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>RON BROOMFIELD, Warden of California State Prison at San Quentin,<br><br>　　　　Respondent. | Case No.92-cv-02951-JSW<br><br>**ORDER REGARDING PETITIONER'S MERITS BRIEFING - GROUP III, SUBGROUP TWO CLAIMS (CLAIMS Q AND R)**<br><br>Re: Dkt. No. 441 |

**INTRODUCTION**

Petitioner has filed a brief addressing the merits of the Group III, Subgroup Two claims of his habeas petition. Group III claims allege various constitutional violations stemming from petitioner's alleged incompetence to stand trial. Respondent has filed an opposition and petitioner has filed a reply. Based on the record presented to date, the court finds and orders as follows.

**FACTUAL BACKGROUND**

The following recitation of the factual background of this case is based on the Supreme Court of California's opinion disposing of petitioner's direct appeal, *People v. Mickle*, 54 Cal. 3d 140 (1991). The state court's factual determinations are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1).

In 1986, a jury in San Mateo County Superior Court sentenced petitioner to death following a conviction of first-degree murder and arson. The jury also found true a special

circumstance that he committed the murder while engaged in a lewd and lascivious act on a minor. Evidence at trial established that in February 1983, petitioner took up residence with the victim, twelve-year-old Lashan, and her parents, Darrell Knighten and Sally Phillips, in unit ten of the Mission Bell Motel in Daly City. The motel was occupied primarily by permanent residents.

On February 24, the day of the crimes, Lashan's parents left the motel at noon and drove to Oakland to visit Darrell's grandmother. That afternoon, Sally called petitioner to let him know that a woman who worked at Lashan's school would be dropping Lashan off at the motel. Petitioner promised to take care of her until Sally and Darrell returned. The school employee dropped off Lashan at 4 p.m.

Between 7:30 and 8:30 p.m., a motel resident saw petitioner pace back and forth between unit ten and the phone booth near the motel's office. Petitioner was not seen again until 9:50 p.m., when he arrived at the South San Francisco home of his girlfriend, Ruthie. At 10:30 p.m., he called the motel and asked to speak to the residents of unit ten. After a few moments, he hung up and told Ruthie that no one was home. Petitioner then called Lashan's parents at their relative's house. He told Darrell that he left the motel at 7:30 and needed a key to the unit. Darrell told him that Lashan could open the door.

Darrell and Sally were disturbed by petitioner's phone call and immediately drove home. In the meantime, petitioner told Ruthie that he was going to the Tenderloin and left her house.

At 10:50 p.m., a restaurant employee saw flames shoot out of unit ten's bedroom window. The fire was soon extinguished. Lashan's naked body was found on the bathroom floor. Her back had been stabbed several times. A motel butcher knife was found on a counter near the kitchen sink. The front room, hallway, bathroom and kitchen had been damaged by soot, smoke and heat.

Petitioner returned to Ruthie's house at 2 a.m. and spent the night. At 7 a.m., Ruthie saw a television report which identified petitioner as a suspect in the motel crimes. She told him to leave. He left and she called the police.

Petitioner called the police an hour later and said he had heard about the fire on television and wanted to discuss it. Soon thereafter, he was taken into custody.

Petitioner was interviewed three times in custody. He first spoke with Detectives Reese

and McCarthy, pursuant to a waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and denied committing the crimes. He said he left Lashan asleep at the motel at 8:15 p.m. and took a bus to the Tenderloin district in San Francisco. He said he called Lashan's parents from there and then visited Ruthie.

Petitioner next spoke with his parole officer, Mr. Bandettini, pursuant to another *Miranda* waiver. Petitioner at first denied the crimes, but then claimed not to remember whether he had stabbed Lashan and stated that he may have had sex with her.

Detectives Reese and McCarthy resumed questioning. Petitioner stated that he could have killed Lashan, and did not know what he was doing. He admitted having sex with her, but was not clear about when it occurred. He initially denied setting the fire, but later stated he could have set the fire. He said his actions were not intentional.

Petitioner was arrested at 2 a.m. on February 26, four hours after questioning had begun. On February 27, Detectives Reese and McCarthy again spoke with petitioner at the Chope Hospital jail ward. Petitioner stated that he had started a fire on the murphy bed in the motel room, stamped it out, and then started the fire in the bedroom, using paper each time. Petitioner also told a Chope Hospital nurse that he had killed the 12-year-old daughter of a woman he was living with in a motel and had set the room on fire.

After his arrest, petitioner shared a jail cell with Jeffrey Steele. Steele testified that petitioner said that he had "ta[k]en some young pussy" and killed the girl because she had threatened to tell her parents that he had raped her. Petitioner identified the victim as the 12-year-old daughter of friends he had been living with in a motel. According to Steele, petitioner admitted choking and stabbing the girl, but believed that he would "beat" the charges because no weapon was found and because he had started a fire to conceal the crime.

## PROCEDURAL HISTORY

Trial proceedings took place in San Mateo Superior Court between 1983 and 1986. In August 1990, while his direct appeal was pending, petitioner filed his first state habeas petition. The California Supreme Court denied it in June 1991. The California Supreme Court affirmed petitioner's conviction and sentence in August 1991. *See Mickle*, 54 Cal. 3d at 156. He filed a

3

second state habeas petition in March 1992. It was denied in July 1992.

In April 1997, petitioner filed a federal habeas petition containing exhausted and unexhausted claims. This court stayed petitioner's federal proceedings pending completion of exhaustion proceedings in state court. Petitioner filed his third state habeas petition to exhaust unexhausted claims in December 1997. The California Supreme Court denied this petition on the merits and on procedural grounds in February 2003.

In February 2003, petitioner noticed the filing in this court of his amended petition. Respondent filed an answer in May 2003. Following a case management conference, the parties litigated issues of procedural default. In August 2004, the court issued an order finding several claims procedurally defaulted. Respondent then filed a motion for summary judgment, which the court granted with respect to numerous claims.

The parties subsequently litigated petitioner's entitlement to an evidentiary hearing. On October 1, 2009, the court granted an evidentiary hearing on numerous claims.

In April 2011, the Supreme Court decided *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011), which holds that in determining the reasonableness of a state court's ruling under 28 U.S.C. § 2254(d)(1), federal courts are "limited to the record that was before the state court that adjudicated the claim on the merits." In October 2011, the court decided that in light of *Pinholster*, it would analyze whether any of petitioner's claims survive review under 28 U.S.C. § 2254(d)(1) before holding an evidentiary hearing or granting discovery. Accordingly, the court vacated its order granting petitioner an evidentiary hearing and stayed any discovery litigation pending the court's determination of whether petitioner's claims overcome 28 U.S.C. § 2254(d). Petitioner then filed a brief discussing how his Group I claims satisfy 28 U.S.C. § 2254(d)(1) and/or § 2254(d)(2). The Court denied petitioner's Group I claims. Following further briefing, the Court denied petitioner's Group II and Group III, Subgroup One claims. The instant briefing regarding Group III, Subgroup Two claims followed.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the court should not grant a writ of habeas corpus with respect to any claim that was adjudicated on the

merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A federal court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d) have separate and distinct meanings. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000). A state court's decision is "contrary to" clearly established federal law if it fails to apply the correct controlling authority or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. *Id*. at 413-414. A decision is an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 414.

In *Pinholster*, the Supreme Court held that in determining the reasonableness of a state court's ruling under § 2254(d)(1), federal courts are "limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. at 181. The court explained that "evidence later introduced in federal court is irrelevant to § 2254(d)(1) review." *Id*. at 184.

A summary denial from the California Supreme Court is an adjudication on the merits for purposes of review under the AEDPA. *Id*. at 187. "Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" *Id*. at 188 n.12. To state a prima facie case for relief, a petitioner must (1) allege that he is illegally imprisoned, (2) state "with particularity the facts on which relief is sought", and (3) "include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations". *People v. Duvall*, 9 Cal. 4th 464, 474 (1995). In reviewing a state habeas petition, the California Supreme Court "generally assumes the allegations in the petition to be true, but does not accept wholly conclusory

5

allegations . . . and will also 'review the record of the trial ... to assess the merits of the petitioner's claims.'" *Pinholster*, 563 U.S. at 187.  If the California Supreme Court determines that a petition fails to state a prima facie case for relief, it will summarily deny the petition.  *Duvall*, 9 Cal. 4th at 475.  If, however, the California Supreme Court determines that the factual allegations, taken as true, establish a prima facie case, it will issue an order to show cause.  *Id*.

The United States Supreme Court has made clear that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation omitted).  "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision;" the court must not "overlook[] arguments that would otherwise justify the state court's result . . . ." *Id*.

If constitutional error is found, however, habeas relief is warranted only if that error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).  Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)); *accord Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015).

## DISCUSSION

### 1) Claim Q

In claim Q, petitioner asserts that he was denied his right to reasonably competent psychiatric assistance.  Due to the similarity between claim Q and claim LL10, petitioner offers no additional briefing in support of claim Q.  In claim LL10, petitioner alleged that trial counsel were ineffective for presenting non-meritorious psychiatric testimony.  The Court denied claim LL10 in a previous Order.  *See* ECF Dkt. No. 430.  Respondent contends that petitioner cites no cognizable legal basis in support of claim Q.

Respondent is correct.  Under *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985)*,* the state must provide an indigent defendant with *access* to psychiatric assistance at the guilt phase of a trial.

6

*Ake* does not dictate, however, that the competence of psychiatric assistance may be "tested by subsequent review of its substance in a federal habeas corpus proceeding." *Harris v. Vasquez*, 949 F.2d 1497, 1518 (9th Cir. 1990). As the Supreme Court has recognized, "psychiatrists disagree widely and frequently on what constitutes mental illness." *Ake*, 470 U.S. at 81. Allowing battles between psychiatric experts "during successive collateral challenges to a death sentence would place federal courts in a psycho-legal quagmire resulting in the total abuse of the habeas process." *Harris*, 949 F.2d at 1518. Petitioner's challenge of the competence of his psychiatric experts is not supported by authority. Accordingly, claim Q is denied.

**2) Claim R**

Petitioner alleges that his right to be competent during trial was violated. He asserts that the failure of defense counsel to determine his competence during the guilt phase and the inadequacy of the competency hearing that took place in 1985 prior to the commencement of the penalty phase violated his due process right to not be tried while incompetent. Respondent disagrees, stating that petitioner's claim is based on the diverging opinions of experts retained more than a decade after petitioner's competence to stand trial was litigated and determined against him.

Petitioner was taken into custody on February 25, 1983, and interrogated by police detectives. During the interrogation, he appeared ill and distraught. AG001218; AG001248. The next day, he was admitted to Chope Community Hospital for evaluation and was subsequently hospitalized until March 17, 1983. Petitioner was diagnosed with "paranoid schizophrenia in acute exacerbation." AG012865. He experienced agitation, hallucinations, was placed in restraints, attempted suicide and was heavily medicated with Haldol. AGO12863-65. Petitioner was evaluated on February 28, 1983, by Dr. George Wilkinson, a psychiatrist for San Mateo County's Courts and Corrections Services. During the visit, petitioner at times appeared completely lucid, and at times appeared to suffer from visual hallucinations. Dr. Wilkinson determined that petitioner should be re-interviewed once his mental status had cleared. AO12872-73.

By March 17, 1983, petitioner's condition had substantially improved. Petitioner could

converse in a logical fashion, denied any suicidal intent and denied that voices were telling him what to do. He exhibited no "outward manifestation of psychosis." AG012685. He was released to the main jail with a prescription for medications.

In jail, petitioner continued to be routinely monitored and evaluated. Dr. Richard Hayward, a clinical psychologist for the County of San Mateo, evaluated petitioner multiple times. Over the course of Dr. Hayward's evaluations, petitioner's condition fluctuated. Occasionally, he was deemed a "high suicide risk," s*ee*, *e.g*., AG013198, but also showed no sign of delusional thinking or psychosis, *see, e.g*., AG012959, AG013179.

Dr. Wilkinson continued to regularly visit and evaluate petitioner in jail. AG013154-AG013204. His consultation notes show that despite intermittent fluctuations, petitioner on numerous occasions was deemed free of symptoms of psychosis and denied hallucinating or having suicidal ideations. On May 20, 1983, Dr. Wilkinson noted that petitioner reported feeling better without medication as his thinking was clearer. AG013181. Petitioner thought it was "important that his concentration remain good so he could understand the procedures in his legal case." *Id*. On September 17, 1984, petitioner reported doing well despite the fact that his trial was in the near future. AG13157. Dr. Wilkinson reported no evidence of psychotic symptomatology or suicidal thought. *Id*.

Petitioner's guilt-phase trial commenced on October 8, 1984. On October 9, 1984, the second day of trial, the judge requested that petitioner undergo an evaluation because he had fallen asleep in court. Petitioner was seen by Dr. Wilkinson. AG013155. It was determined that petitioner had not taken any of his medications that month, had gotten anxious during trial, requested his medications in the morning and had become drowsy by afternoon. Petitioner's thinking, however, appeared lucid and intact. Petitioner wished to discontinue his medication. It was agreed that if he experienced any psychotic symptomatology as opposed to mere anxiety from trial, he would inform the nursing staff and would be re-evaluated. *Id*.

After petitioner was found guilty at the conclusion of the guilt-phase of his trial, his condition deteriorated. He was referred for an evaluation with Dr. Wilkinson due to a concern that he might become suicidal. Dr. Wilkinson noted that petitioner appeared to be rational and non-

8

delusional but reported suicidal ideation following his conviction. AG013154. It was recommended that petitioner be moved to a cell with others or with a camera for observation. *Id*.

In November 1984, after the guilt verdict, petitioner's counsel, Philip Barnett and Vincent O'Malley, filed a motion requesting a competence hearing. Judge Clarence Knight granted the motion. Criminal proceedings were suspended. Psychiatrists were appointed to examine petitioner. Attorney Digiacinto was appointed to represent petitioner at the competence hearing. *Mickle*, 54 Cal. 3d 181.

Dr. Harvey Dondershine and Dr. Harvey Small were appointed by the court to examine petitioner. AG015160. Dr. Dondershine examined petitioner on November 9, 1984. Recognizing that the determination of competence is context-dependent, he found that:

> If the availability to defendant and counsel of the events -- both physical and mental -- surrounding the crime are necessary, and if the defendant needs to be free of the fixed belief that he will be murdered within 48 hours of imprisonment so as to be competent to choose among sentencing alternatives which would only come into effect beyond 48 hours of imprisonment, then Denny Mickle is not presently trial competent. If all the necessary facts are available to counsel anyway and the defendant cannot effectively interfere with counsel's appropriate legal tactics, and since neither criminal responsibility nor guilt phase competency remain issues for trial level adjudication, then Denny Mickle is presently trial competent.

AG015173. Dr. Dondershine concluded that petitioner suffers from chronic schizophrenia and is trial incompetent. AG015174.

In a conversation with his attorney, Vincent O'Malley, petitioner mentioned that he saw a vision of Lashan during jury selection. AG015390. Petitioner did not tell his attorney about this experience until after the conclusion of the guilt phase of trial. *Id*. Petitioner stated that he "was holding up alright" during the remainder of the trial. AG015391.

Dr. Dondershine examined petitioner once again on June 8, 1985, shortly before petitioner's competency hearing. During this evaluation, he found petitioner to be competent and to no longer be suffering from schizophrenia. He determined that petitioner could "understand the functions of the various actors in the criminal justice system", was in contact with reality and able to be "present at trial or communicate with counsel." AG015175. Dr. Dondershine noted, however, that petitioner refused to "defend against the death penalty" due to his belief that all

9

1  convicted child murders at San Quentin were murdered by other inmates within 24 hours.
2  Petitioner preferred to commit suicide rather than face long-term commitment. AG015175-76.
3  Dr. Dondershine concluded that petitioner was using the threat of suicide as a means to disrupt
4  court proceedings. *Id*. Dr. Dondershine did not testify at the competency hearing.

5        Petitioner's competency hearing took place over 3 days in June 1985. A new jury was
6  empaneled. Judge Pro Tempore Browning presided over the proceedings. Two court-appointed
7  psychiatrists, Dr. Small and Dr. Bryan, testified. Both stated that they had recently examined
8  petitioner and found him able to understand the proceedings and assist counsel. A deputy sheriff
9  described petitioner's behavior in jail during the preceding year to be excellent. The jury found
10  petitioner to be competent to stand trial. *Mickle*, 54 Cal. 3d 182.

11        Petitioner now alleges violations of procedural due process and substantive due process.
12  Each shall be discussed below.

### A. Incompetence to Stand Trial

14        A criminal defendant has a constitutional due process right not to be tried or convicted
15  while incompetent to stand trial. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). To establish a
16  violation of this right, a defendant must show that at the time of trial, he lacked either sufficient
17  ability to consult with his lawyer with a reasonable degree of rational understanding, or a rational
18  and factual understanding of the proceedings against him. *See Dusky v. United States*, 362 U.S.
19  402, 402 (1960). The issue of a defendant's competency to stand trial implicates both the
20  procedural and substantive dimensions of the right to due process. *Watts v. Singletary*, 87 F.3d
21  1282, 1286 (11th Cir. 1996). Petitioner alleges that his procedural due process rights were
22  violated by the state trial court's failure to conduct a competency hearing on its own initiative, and
23  that his substantive due process rights were violated because he was tried while incompetent.

#### 1) Procedural Incompetence

25        A trial court must order a psychiatric evaluation or conduct a competency hearing sua
26  sponte if the court has a good faith doubt concerning the defendant's competence. *Pate v.*
27  *Robinson*, 383 U.S. 375, 385 (1966); *see also Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir.
28  2004) (calling a claim of trial court error for failing to conduct a competency hearing a

10

1   "procedural incompetence claim"). This responsibility continues throughout trial. *Drope*, 420
2   U.S. at 181. Various factors are relevant to determining whether a hearing is necessary, including
3   evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion
4   on competence to stand trial. *Id.* at 180. "In reviewing whether a state trial judge should have
5   conducted a competency hearing, we may consider only the evidence that was before the trial
6   judge." *McMurtrey v. Ryan*, 539 F.3d 1112, 1119 (9th Cir. 2008). A defendant must show that
7   there was "substantial evidence" that he was mentally incompetent to stand trial. *Moore v. United*
8   *States*, 464 F.2d 663, 666 (9th Cir. 1972). The state trial and appellate courts' findings that the
9   evidence did not require a competency hearing under *Pate* are findings of fact to which we must
10  defer unless they are "unreasonable" withing the meaning of 28 U.S.C. § 2254(d)(2). *Davis*, 384
11  F.3d at 644.

12  Petitioner alleges that the trial court should have ordered a competency hearing because it
13  was presented with substantial evidence of petitioner's incompetence. ECF Dkt. No. 441 at 43-44.
14  Specifically, he asserts that during a hearing on petitioner's motion to suppress his statements, the
15  trial judge heard evidence of petitioner's physical and mental states during his interrogation and
16  commitment at Chope Community Hospital, and later witnessed petitioner fall asleep during his
17  trial. Furthermore, petitioner alleges that he informed the trial court that he did not understand the
18  agreement pursuant to which his competency trial would be held before a commissioner. Finally,
19  petitioner alleges that petitioner's insistence on wearing jail clothes during trial and failure to
20  object to being shackled in front of the jury provided evidence of his incompetence.

21  As noted above, petitioner did have a competency hearing at the request of his counsel
22  after the conclusion of the guilt phase and prior to the penalty phase of trial. Petitioner thus
23  appears to argue that a competency hearing should have been held either in the guilt phase or later
24  in the penalty phase. As discussed below, petitioner fails to establish that the trial judge was faced
25  with substantial evidence warranting a hearing at either juncture. *Moore*, 464 F.2d at 666.

26  Petitioner argues that evidence of petitioner's physical and mental state during his
27  interrogation and at Chope Community Hospital warranted a competence inquiry. Evidence
28  presented to the trial judge established that in early 1983, petitioner had been hospitalized in

11

1  Chope's psychiatric ward. Nurse Rose Marie Gaivizzo testified that petitioner had been strapped
2  to a bed in four-point restraints and appeared to have a major psychiatric abnormality.
3  AG002008-09; AG003679-80. *See also* AG003143-45 (detective Thomas Reese's testimony
4  stating that petitioner felt ill and distraught during his interrogation). Nurse Gaivizzo also
5  testified, however, that petitioner was prescribed Haldol, which eliminates symptoms of psychosis,
6  AG003688, AG003690, and that by March 14, 1983, petitioner was clear, coherent and lucid.
7  AG002022. Petitioner's trial did not commence until October 1984. The evidence presented to
8  the trial judge establishes that petitioner suffered mental illness in 1983, but not that he lacked
9  understanding of his trial proceedings or was unable to assist in his defense in 1984. The evidence
10 cited by petitioner was not sufficient to require further inquiry into petitioner's competence.

11 Petitioner's failure to stay awake on the second day of trial also did not create sufficient
12 doubt as to his competence such that a hearing was warranted. After observing petitioner fall
13 asleep, the trial judge requested that petitioner undergo an evaluation, which was performed by Dr.
14 Wilkinson. Following the evaluation, Dr. Wilkinson determined that petitioner's drowsiness had
15 been caused by medication requested by petitioner. AG013155. It was agreed that if petitioner
16 experienced any psychotic symptoms, he would inform the nursing staff and would be re-
17 evaluated. *Id*. The trial judge's inquiry into the situation was sufficient.

18 Petitioner next alleges that his lack of understanding of the agreement pursuant to which
19 his competency trial would be held before a commissioner rather than his trial judge necessitated
20 an inquiry regarding his competence. The trial transcript shows that petitioner expressed
21 confusion as to how a "Commissioner can play the part of a Judge." AG001699. The court
22 explained that under the California Constitution, "a Commissioner may sit as a Judge Pro Tem
23 with the stipulation of both parties," and that petitioner had signed such a stipulation. AG001700.
24 Petitioner stated that he did not understand the stipulation. AG001701. The court, however,
25 found that he had, in fact, entered a "knowing and intelligent stipulation." AG001703. The trial
26 transcript at most reveals petitioner's confusion regarding the technicalities of having a
27 commissioner sit as a judge pro tem rather than petitioner's lack of a rational understanding of the
28 proceedings against him. In any event, petitioner's statements were made in the context of

United States District Court
Northern District of California

1  preparations for a competency hearing. At that juncture, petitioner was getting the competency
2  hearing that he claims was warranted.
3        Finally, petitioner alleges that his insistence on wearing jail clothes and being shackled in
4  front of the jury should have triggered an examination of his competence. A defendant's choice to
5  wear prison clothes does not necessarily trigger a competency hearing. *See*, *e.g.*, *Davis*, 384 F.3d
6  at 645 (defendant's refusal to wear civilian clothes did not give rise to sua sponte duty to order
7  competency hearing). Here, the court questioned petitioner about his decision and was satisfied
8  that petitioner rationally understood his right to forego prison garb and shackles. AG001503-04.
9  In light of this, petitioner's choice of clothing did not warrant a competency hearing.
10        Overall, petitioner's history, statements and conduct did not create "substantial evidence"
11  of incompetence before the trial judge, nor was there evidence to suggest that the judge should
12  have experienced doubt with respect to petitioner's competence to stand trial. *See Davis*, 384 F.3d
13  646. The trial judge did not err in failing to sua sponte hold a competency hearing. Accordingly,
14  the California Supreme Court's denial of this claim was not an unreasonable application of clearly
15  established federal law under section 2254(d)(1), or an unreasonable determination of the facts
16  under section 2254(d)(2).
17        2)  **Substantive Due Process**
18        "An individual is competent to stand trial if 'he has sufficient present ability to consult
19  with his lawyer with a reasonable degree of rational understanding—and . . . he has a rational as
20  well as factual understanding of the proceedings against him.'" *Boyde v. Brown*, 404 F.3d 1159,
21  1165 (9th Cir. 2005) (quoting *Dusky*, 362 U.S. at 402). The question "is not whether mental
22  illness substantially affects a decision, but whether a mental disease, disorder or defect
23  substantially affects the prisoner's capacity to appreciate his options and make a rational choice."
24  *Dennis v. Budge*, 378 F.3d 880, 890 (9th Cir. 2004). The competency inquiry "has a modest aim:
25  it seeks to ensure that [the defendant] has the capacity to understand the proceedings and to assist
26  counsel." *Godinez v. Moran*, 509 U.S. 389, 402 (1993). In reviewing claims of actual
27  incompetence, courts may consider facts and evidence that were not available to the state trial
28  court before and during trial. *Williams*, 384 F.3d at 608. Retroactive determinations of

incompetence, however, are disfavored and considerable weight must be accorded to the lack of contemporaneous evidence of a petitioner's incompetence to stand trial. *Id*.

Petitioner supports his allegations of actual incompetence to stand trial with declarations from various experts. He submits the opinions of Dr. Dondershine, Dr. Pierce, Dr. Haney, Dr. Benson, Dr. Walker, Lorelei Sontag, Dr. Small and Dr. Bryan, as well as post-conviction evaluations of Dr. Dale Watson, Dr. George Woods and Dr. Yvette Guerrero. Relying on these declarations, he argues that he was incompetent throughout his trial. As discussed below, his arguments are unavailing.

Petitioner alleges that he was incompetent during the guilt phase of his trial. None of his supporting declarations, however, are based on examinations of petitioner conducted before or during the guilt phase of trial. Petitioner discusses in detail the opinion of Dr. Dondershine, who was appointed by the trial court to conduct a competency exam *after* the conclusion of the guilt phase. As noted above, on November 9, 1984, noting that competency is context-dependent, Dr. Dondershine found petitioner incompetent for purposes of the penalty phase. AG015174. In June 1985, however, following another examination shortly before petitioner's competency hearing, he found petitioner to be competent. AG015175. Petitioner also submits Dr. Dondershine's post-conviction declaration, executed in 1997, in which he opines that based on a review of petitioner's mental health medical records – which previously were not provided to him – it is highly likely that petitioner was incompetent during the guilt phase of trial. AG017548. To the extent that Dr. Dondershine's declaration is based on a post-conviction review of petitioner's medical records, it constitutes a retroactive competency determination disfavored by the courts. *Williams*, 384 F.3d at 608.

By contrast, Dr. Donald Lunde, a mental health expert who did, in fact, examine petitioner before the guilt phase of trial, did not discern impairment. Dr. Lunde was retained by the defense and examined petitioner prior to the guilt phase. Dr. Lunde reported that he did not think that "there was much in the way of a mental defense, disease or defect." AG017974.[1]

---

[1] The defense also retained Dr. Samuel Benson to conduct a sodium amytal test to determine the truth of petitioner's denial of guilt, but the test was not successful in revealing further information.

14

Other contemporaneous medical records document petitioner's mental health before and during the guilt phase of trial. Dr. Hayward, a psychologist, and Dr. Wilkinson, a psychiatrist, both routinely visited petitioner and monitored his mental health in jail. Although neither Dr. Hayward nor Dr. Wilkinson was tasked with evaluating petitioner's competency, they took note of the absence of symptoms of delusional thinking or psychosis during their visits. *See*, *e.g.*, AG013179; AG013181. In September 1984, a month before the commencement of trial, petitioner reported feeling well despite the fact that his trial was in the near future, and Dr. Wilkinson reported no evidence of psychotic symptomatology or suicidal thought. AG13157.

Moreover, petitioner's own trial counsel did not doubt petitioner's competency during the guilt phase. AG017987-88. This undermines petitioner's claim of incompetence. *See Medina v. California*, 505 U.S. 437, 450 (1992) ("defense counsel will often have the best informed view of the defendant's ability to participate in his defense"); *see also Hernandez v. Ylst*, 930 F.2d 714, 718 (9th Cir. 1990). Additionally, a deputy sheriff described petitioner's behavior in jail to have been excellent. *Mickle*, 54 Cal. 3d 182. The afore-mentioned evidence provides significant indications of competence.

In arguing actual incompetence, petitioner proffers the declarations of Dr. Pierce, Dr. Haney and Ms. Sontag as contemporaneous evidence of his incompetence. Similarly to Dr. Dondershine, they did not examine petitioner before or during the guilt phase, which concluded at the end of October 1984. Dr. Pierce was a clinical psychologist retained by the defense who interviewed petitioner six times between December 1984 and May 1985, and administered a battery of psychological tests. He diagnosed petitioner with borderline personality disorder and noted that it was not uncommon "for this type of personality disorder to experience brief reactive psychotic episodes under stress." AG015290, AG017886. Dr. Haney was a psychologist who testified for the defense during the penalty phase about petitioner's pedophilia, paranoid personality and borderline retardation. *Mickle*, 54 Cal. 3d 194. In a declaration executed in May 1997, Dr. Haney states that he interviewed petitioner eight or nine times between December 1984

---

AG01796.

and December 1985, and does not think that petitioner "ever fully understood what was being done in his case, and it did not appear that he was able to participate meaningfully in the conduct of his own defense." AG017637. Ms. Sontag worked as an investigator during the penalty phase. In a declaration executed in June 1997, she states that her impression of petitioner was that "he had a very limited understanding of the world, akin to that of a young child." AG017921. Petitioner further cites the testimony of Dr. Walker, a psychologist who testified for the defense at the penalty phase of trial. Petitioner points out that Dr. Walker testified that petitioner probably committed the murder in a psychotic state. ECF Dkt. 441 at 29. Finally, petitioner submits the declarations of Dr. Dale Watson, Dr. George Woods and Dr. Yvette Guerrero, all of whom conducted post-conviction evaluations of petitioner. Dr. Watson's neuropsychological evaluation of petitioner in 1996 yielded "substantial evidence of cognitive, language, problem- solving and executive deficits." AGO17949. Dr. Woods, a psychiatrist, examined petitioner in 1995 and determined that petitioner's "complex brain impairment and neurological deficits" interfered with his ability to understand the proceedings against him and rationally assist his counsel. AGO18023. Finally, Dr. Guerrero, a psychologist, conducted a social history of petitioner in 1997 and determined that petitioner was vulnerable to developing significant mental impairments based on predisposing social, familial and environmental factors. AG017560-AG017630.

  Although the declarations submitted in support of petitioner's claim are voluminous, they are based on examinations of petitioner that took place after the conclusion of the guilt phase of trial. Given the significant evidence of petitioner's competence during the guilt phase of trial, including Dr. Lunde's finding of no impairment, the medical records of Dr. Hayward and Dr. Wilkinson noting the absence of delusional thinking or psychosis shortly before trial, petitioner's counsel's lack of doubt as to his competency and a sheriff's description of his excellent conduct in jail, petitioner fails to demonstrate that the state court's denial of petitioner's claim was objectively unreasonable.

  To the extent that petitioner submits expert declarations to establish incompetence during the penalty phase, his allegations are also unavailing. The declarations establish that petitioner suffered from mental illness. Mental impairment, however, does not necessarily entail in

16

incompetence to stand trial. The U.S. Supreme Court has recognized that those with intellectual disabilities "frequently...are competent to stand trial." *Atkins*, 536 U.S. 304, 318 (2002); *see also Boyde v. Brown*, 404 F.3d 1159, 1166–67 (9th Cir.) (noting that people with mental deficiencies are not necessarily incompetent to stand trial), amended in other respects, 421 F.3d 1154 (9th Cir. 2005).

The declarations of some experts, such as Dr. Haney and Dr. Woods, do state that petitioner's deficits interfered with his understanding of his trial proceedings. These declarations, however, were executed in 1997, even though some, such as the declaration of Dr. Haney, were based on examinations of petitioner that took place in 1984 and 1985. To the extent that these declarations are based on a post-conviction review of petitioner's contemporaneous medical records, they constitute a retroactive competency determination disfavored by the courts. *Williams*, 384 F.3d at 608.

Moreover, prior to the commencement of the penalty phase, the jury found petitioner competent to stand trial. *See Mickle*, 54 Cal. 3d at 155. At petitioner's competency hearing, two court-appointed psychiatrists, Dr. Small and Dr. Bryan, testified that they had recently examined petitioner and found him able to understand the proceedings and assist counsel. *Id*. at 182. Neither psychiatrist found petitioner to suffer from a serious mental disorder. *Id*. at 184. In denying petitioner's claim, the state court could have reasonably accorded more weight to the results of the competency hearing and the contemporaneous opinions of Dr. Small and Dr. Bryan rather than the opinions of expressed in declarations executed by experts in 1997.

Petitioner discounts the opinions of Dr. Small and Dr. Bryan, arguing that both experts failed to adequately consider petitioner's mental health history and therefore did not conduct an appropriate competency examination. As stated in the discussion of claim Q above, the competence of psychiatric assistance may not be "tested by subsequent review of its substance in a federal habeas corpus proceeding." *Harris*, 949 F.2d at 1518. Petitioner's allegations to the contrary lack merit.

In sum, given the contemporaneous evidence of petitioner's competence, the limited weight that the California Supreme Court could reasonably have placed on petitioner's post-

conviction declarations and in light of the deference due under AEDPA, it was not unreasonable for the California Supreme Court to deny petitioner's claim. The California Supreme Court's denial of petitioner's claim of actual incompetence was not an unreasonable application of clearly established federal law under section 2254(d)(1), or an unreasonable determination of the facts under section 2254(d)(2). Accordingly, the Court DENIES Claim R.

## CONCLUSION

For the above-mentioned reasons, claims Q and R are denied. The remainder of petitioner's Group III, Subgroup Two claims shall be addressed in a subsequent Order.

**IT IS SO ORDERED.**

Dated: October 13, 2023

JEFFREY S. WHITE
United States District Judge